[Cite as *State v. Suttle*, 2026-Ohio-2478.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                     :          APPEAL NO.   C-250434
                                              TRIAL NO.    B-2302893
    Plaintiff-Appellee,        :

 vs.                               :

MICAH SUTTLE,                      :
                                              *JUDGMENT ENTRY*
    Defendant-Appellant.       :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 6/30/2026 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *State v. Suttle*, 2026-Ohio-2478.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-250434 |
| | | TRIAL NO. | B-2302893 |
| Plaintiff-Appellee, | : | | |
| vs. | : | *OPINION* | |
| MICAH SUTTLE, | : | | |
| Defendant-Appellant. | : | | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 30, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Norbert Wessels,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Roger Kirk*, for Defendant-Appellant.

**ZAYAS, Judge.**

{¶1}     After a jury trial, Micah Suttle was convicted of having weapons while under a disability ("WUD") and carrying concealed weapons ("CCW"). In four assignments of error, Suttle contends the trial court erred by overruling his motions to suppress, his convictions were not supported by sufficient evidence and contrary to the manifest weight of the evidence, and the prosecutor committed misconduct by shifting the burden of proof in closing arguments. For the following reasons, we affirm the judgment of the trial court.

## Factual Background

{¶2}     Suttle was indicted for WUD and CCW. He filed a motion to suppress challenging the search of his vehicle. After the trial court overruled the motion to suppress, Suttle filed a second motion to suppress, arguing that his *Miranda* rights were violated when the police asked him about guns. The court overruled the motion, and Suttle proceeded to a jury trial. The jury convicted Suttle of both counts.

{¶3}     Suttle filed a motion to suppress alleging that the search of his vehicle violated the Fourth Amendment because the police did not have probable cause to search his vehicle. In the motion, Suttle also argued that any statements given to officers should be suppressed because he was unlawfully arrested and the statements were not voluntarily made, made without the benefit of counsel, and made without *Miranda* warnings. At the hearing, the parties agreed it was a warrantless search, and the hearing was limited to whether the search was legal.

{¶4}     A Cincinnati Police Department ("CPD") sergeant testified that he received a radio broadcast, while in Bond Hill, that someone in a silver vehicle with an Ohio temporary tag had brandished a firearm while driving. The sergeant observed a silver sedan with an Ohio temporary tag in the parking lot at a corner store on Paddock

Road. The sergeant pulled into the parking lot to observe the vehicle. At the time, the sergeant was in plainclothes and driving an unmarked vehicle.

{¶5} The sergeant observed Suttle in the driver's seat and a person exit from the store and enter the vehicle. As the car drove off, Suttle and his two passengers gave him the finger. The sergeant explained that many people in the neighborhood know which cars the undercover officers drive and acknowledged that their conduct was not illegal. When people give him the finger, it makes him pay more attention to them. In this instance, the sergeant was observing Suttle because the car matched the description of the suspect's vehicle from the broadcast.

{¶6} After the vehicle left the store, the sergeant followed it and had another officer query the license plate to determine if it was the suspect vehicle. Undercover vehicles do not have computers, so he was unable to run the license plate number. The vehicle pulled into a driveway not far from the store, and all three occupants exited from the vehicle and walked down the street on the sidewalk. The sergeant's body-worn-camera ("BWC") video was admitted into evidence.

{¶7} Suttle jaywalked across the street, and the sergeant gave him a verbal warning without a citation. Then Suttle jaywalked again, and the sergeant decided to issue a citation. A second plainclothes officer, who was now present on the scene, placed Suttle under arrest because Suttle had open warrants. Suttle also had a pending indictment for aggravated robbery.

{¶8} Suttle's car was parked at the end of a driveway, blocking the sidewalk, in violation of a city ordinance. The sergeant did not know whose house it was and testified that Suttle did not pull into the back of the driveway. Suttle had claimed the house was his residence, but the sergeant had no way to confirm that information. At some point, the sergeant learned that Suttle's vehicle was not the suspect car in the

4

broadcast.

**{¶9}** The sergeant testified that after Suttle initially parked the vehicle, he exited from the driver's seat. Suttle walked away from the vehicle, then returned and accessed the driver's compartment. The police obtained Suttle's car keys from him.

**{¶10}** The second officer authenticated his BWC video, and the State played the video. The second officer had also observed Suttle exiting from the vehicle and saw Suttle moving around in the vehicle. Then, he observed Suttle go back to the vehicle, roll up the windows, and lock the car doors before again walking away from the car.

**{¶11}** The second officer testified that he observed, and the video depicted, marijuana shake all over the middle console and floorboard of the vehicle and a designer marijuana bag between the passenger seat and the middle console. He testified that designer marijuana bags are typical for marijuana traffickers to carry their marijuana. At this time, marijuana was still illegal in Ohio. The officer believed that Suttle was attempting to distance himself from the car.

**{¶12}** A recording of the search captured a third officer saying "gun" and "here's the box for it." The third officer found the gun in the pocket of the driver's door.

**{¶13}** On cross-examination, the second officer testified that the protocol since July 2019 was to confiscate small quantities of marijuana but not to charge folks for amounts under 100 grams. He explained that "designer bags that we know that they are used to sell marijuana in, that's still illegal." The officer decided to search the vehicle to prevent the destruction of evidence. Although Suttle had been arrested, anyone could access the vehicle by breaking into it and destroying the evidence.

**{¶14}** Suttle had misdemeanor warrants for traffic capiases. When he learned

about the warrants, the second officer decided to arrest Suttle. When he saw the marijuana and marijuana bag, he suspected trafficking. In his experience, drugs and guns "go together." Traffickers typically possess firearms to protect their drugs and currency. The officer further testified that it adds to reasonable suspicion when a person rolls up the windows and locks the car door. Suttle locked the vehicle and walked away after the police were present, suggesting that Suttle attempted to distance himself from the vehicle.

{¶15} The parties proceeded to closing arguments. The State argued that exigent circumstances supported the search because it was a car, and the officers had probable cause after observing marijuana and the trafficking indicator. Suttle argued that there were no exigent circumstances because the car was parked and Suttle had been arrested and no evidence could be destroyed. He further argued that the plain-view exception did not apply based on the video, and that Cincinnati police were not prosecuting marijuana crimes, so the officer did not have probable cause.

{¶16} The court overruled the motion finding that the officer observed marijuana in plain view, giving him probable cause to search the vehicle.

{¶17} The night before trial, Suttle sought leave to file and filed a second motion to suppress seeking to suppress an incriminating statement that he had made after his arrest and prior to the administration of his *Miranda* warnings. The trial court allowed the motion to proceed because it just concerned one statement, and "we don't need to bring the officers up."

{¶18} At the hearing, Suttle explained that he sought to exclude his statement admitting that his wife's gun was probably in the car, prompted by the second officer's questioning whether any guns were in the vehicle. Suttle confirmed to the court that the motion was limited to excluding that one statement.

{¶19} The parties agreed to stipulate to the evidence after listening to a five-minute clip of the second officer's BWC video. After Suttle was placed under arrest, the second officer approached him and informed him that he had seen marijuana in the vehicle and was going to search the vehicle. The second officer asked, "Is there any guns in the car, other than weed?" Suttle responded, "There wasn't no weed in there." The officer told him about the marijuana shake and the baggie in the car and said, "The car is going to be searched, is there any firearms?" Suttle responded, "It's probably my wife's gun, but it's registered to her."

{¶20} Suttle argued that the statement should be suppressed because the second officer had arrested Suttle, the second officer failed to inform him of his *Miranda* rights, and the second officer's question was designed to elicit an incriminating statement.

{¶21} The State argued that the officers responded to a "gun run," observed marijuana in the car and were about to execute a search on the vehicle. The officers were looking for a gun, and guns can be dangerous. The State further argued that the question was asked for officer safety.

{¶22} The court overruled the motion after determining the question was asked for officer safety. The court further explained that Glock's have no safety, just a switch, and said the gun in this case was an SCCY, fully automatic, and if touched the wrong way, it could go off. Depending on the weapon, it "can go off."

{¶23} The matter proceeded to trial. The CPD sergeant, who testified at the hearing on the motion to suppress, testified about the dispatch for a subject armed with a gun in a silver sedan in Bond Hill in the area of Paddock and Laidlaw and his encounter with Suttle at the corner store. After leaving the store, Suttle's vehicle traveled a short distance, only a few driveways, and pulled into a driveway. Only 30

seconds elapsed from the time the sergeant first saw the vehicle in the parking lot and when it parked in the driveway.

{¶24} The sergeant pulled behind the vehicle to ascertain the license plate to determine if there were any issues. At that time, he was still investigating the initial gun report. The three occupants exited from the vehicle and began to walk eastbound on the sidewalk, adjacent to the vehicle, and jaywalked across the street. The other two passengers continued walking east after jaywalking once and did not return. A portion of the sergeants BWC video was played, showing Suttle jaywalking.

{¶25} A third officer in uniform determined that the car was registered to Suttle as a co-owner, and that he had outstanding warrants for his arrest. That officer relayed the information to the second officer who arrested Suttle due to the outstanding warrants. The sergeant's BWC video was admitted into evidence.

{¶26} The sergeant testified that a gun was found in the driver's door of the car. The sergeant explained that the gun was not submitted for a fingerprint or DNA analysis because Suttle co-owns the vehicle so his DNA was probably on every item in the vehicle, and fingerprints are rarely found on firearms. Additionally, he did not submit the gun for testing because Suttle owned the vehicle, drove the vehicle, and the gun was found in the driver's door, two inches from the driver's seat. The sergeant did not observe Suttle reach for or touch the gun.

{¶27} The second officer testified that he responded to the scene to assist the sergeant. The officers were investigating a "gun run," and Suttle's vehicle matched the description. He observed Suttle jaywalking and the sergeant speaking with him. A uniformed officer informed him that Suttle was attached to the vehicle and had misdemeanor warrants for his arrest. The second officer observed Suttle's photograph, confirmed his identity, and took him into custody.

**{¶28}** After arresting Suttle, the second officer searched him and placed him into a vehicle to determine whether he would have to be transported to the jail for his warrants. He looked inside Suttle's vehicle and saw marijuana residue and assorted baggies. The officer testified that before he searches any vehicle, he asks if there are any firearms in the car for officer safety. When he asked Suttle, Suttle hesitated then said, "Probably, but it's my wife's, sir." The officer further explained that he asks about his guns due to his experience and the fact that there are very "unreliable guns" and when searching a vehicle, officers manipulate things with their hands, squeezing and moving things. The second officer searched the vehicle with a third officer, who observed the gun within seconds of opening the driver's door.

**{¶29}** Suttle admitted to the officer that he could not legally possess a firearm. He further informed the officer that he was not initially driving the vehicle when they first pulled up to the store, and the person who was driving left the gun in the car. Suttle further explained that he locked the doors and rolled up the windows when he learned about the gun. When confronted with his statement that it was his wife's gun, he explained that it was his girlfriend, and the other guy was a friend of hers.

**{¶30}** The second officer asked Suttle about the gun before reading him his *Miranda* warnings because officer safety was paramount. He was going to search the vehicle regardless of Suttle's response. The officer believed that Suttle knew the gun was in the car because Suttle knew his wife had a concealed-carry license and carried a firearm and knew he was not allowed to be near firearms. Then Suttle changed his story and said the gun belonged to "some girl he messed with, who was not his wife, and then it belonged to a friend." Based on the location of the gun, the second officer believed Suttle had control over the gun.

**{¶31}** The State's last witness was the officer who found the gun in the car.

9

When he opened the driver-side door, he immediately saw the grip and magazine of a red or maroon pistol sticking out of the door pocket. The officer removed the gun from the door, removed the magazine, and ejected one round to render it safe. A live round was in the chamber.

{¶32} The State played the officer's BWC video, showing how the car was parked and the officer discovering the gun. The gun was a SCCY, which is a semi-automatic pistol. The gun was accessible to the driver and was inches from the driver's seat. The third officer test-fired the gun and found it operable. The firearm report was admitted into evidence.

{¶33} Suttle's fiancée testified that the day before Suttle's arrest, she arrived home very late with her two children. She was very tired, and before she exited from the car, she put her gun inside the car door and went into the house. The fiancée identified the gun as hers. She had purchased the gun at a gun show for her protection.

{¶34} That day, she asked Suttle to buy snacks, and when Suttle returned to her home, he gave her the snacks and went outside to play basketball with her cousins. The fiancée did not tell him that her gun was in the car. She knew he could not be around guns and felt terrible that she forgot that the gun was in the car. Usually, she kept the gun in a safe in her closet on the top shelf. When Suttle would come to her house, she put it in her car so he was not around it.

{¶35} Suttle testified that he was dropped off at his fiancée's home in the morning because his car was not working. When she asked him to purchase snacks, he went to the store with her cousin and her cousin's friend Bubby. They encountered the sergeant at the store, and Bubby flipped him off. The sergeant followed his car when he left the store to his fiancée's house, two streets away. Suttle parked and entered the home with the snacks. When he went back outside, the three started

walking down the street when Suttle realized that he had forgotten to roll up the windows and lock the car doors. When he crossed the street, the sergeant stopped him for jaywalking. Another officer placed him under arrest.

**{¶36}** When the officer asked if there was a gun in the car, Suttle remembered that his fiancée had just purchased a gun, so he said, "Probably. It's probably my wife's." His fiancée did not inform him the gun was in the car, and he did not see the gun in the car. Suttle testified that he was trying to be cooperative. After the second officer found the gun, Suttle was scared and nervous and told the officer things that were not true because he was afraid the officer would "mess with his wife." Suttle testified that he was telling the truth now because he was not scared. If he had known the gun was in the car, he would have told his fiancée to remove it.

**{¶37}** On cross-examination, Suttle was shown the video depicting the gun in the vehicle. Suttle agreed that nothing was covering or concealing the gun, the gun color was different from the door except for the magazine, and that the gun was loaded. He also agreed that the purpose of the pocket of the driver's side door is for the driver to easily access an item. Suttle did not hear the gun rattling as he was driving, and he did not know the gun was in the car. Suttle admitted that he told three different stories identifying the owner of the gun.

**{¶38}** The jury found him guilty of both charges. The trial court sentenced him to serve 30 months on each conviction, to be served concurrently. He now appeals, raising four assignments of error.

### Motions to Suppress

**{¶39}** In his first assignment of error, Suttle argues that the trial court erred in overruling his motions to suppress. He contends that the officer lacked reasonable

suspicion or probable cause to search his vehicle and the officer failed to provide *Miranda* warnings before questioning him about a gun, and his admission should have been excluded.

**{¶40}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence, then independently determine whether the facts satisfy the applicable legal standard. *See State v. Childers*, 2023-Ohio-948, ¶ 7 (1st Dist.), citing *Burnside* at ¶ 8.

**{¶41}** The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8 (1968). "A search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies." *State v. Jackson*, 2022-Ohio-4365, ¶ 10. Under the plain-view doctrine, "an officer may seize an object in plain view without a warrant if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be viewed, (2) the object's incriminating nature is immediately apparent, and (3) the officer has a right to access the object where it is located." *State v. Vargas*, 2025-Ohio-4482, ¶ 22 (2d Dist.), quoting *State v. Burroughs*, 2022-Ohio-2146, ¶ 15, citing *Horton v. California*, 496 U.S. 128 (1990).

**{¶42}** The Ohio Supreme Court has held that an officer who observed marijuana in a vehicle had probable cause to search the vehicle. *See Jackson* at ¶ 28. In *Jackson*, when the first officer opened the car door to secure an uncooperative driver, the second officer looked into the vehicle and observed marijuana. *Id.* at ¶ 16, 23. Jackson argued that the second officer conducted a search by looking through the door. *Id.* at ¶ 23. The Court acknowledged that the second officer intended to obtain information by looking into the car and his body-camera revealed that he took a "long

investigative look." *Id.* at ¶ 24. The Court held the second officer did not conduct a search, under the trespass theory, because "he did not physically enter the car until after he spotted the marijuana cigarette." *Id.* at ¶ 25. Under the *Katz* privacy doctrine, the second officer did not conduct a search because "[a] person does not have a legitimate expectation of privacy in an object that is in plain view." *Id.* at ¶ 26.

**{¶43}** The Court ultimately held,

> Once the second officer observed the marijuana cigarette, he had probable cause to believe that Jackson's car contained contraband. Under the automobile exception to the warrant requirement, officers may search a vehicle without obtaining a warrant when they have probable cause to believe the vehicle contains evidence of illegal activity. Thus, the officers did not transgress the Fourth Amendment when they searched the vehicle and found the pistol.

*Id.* at ¶ 28, citing *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).

**{¶44}** Similarly, here, the second officer observed marijuana in Suttle's vehicle by looking through the window. Once the officer viewed the contraband, he had probable cause to search the vehicle.[1] *See id.*

**{¶45}** Suttle argues that a search based on plain view or exigent circumstances is inapplicable once the car and suspect were secured. As this court recently explained, the mobility of a vehicle is no longer a factor when determining whether a search conducted under the automobile exception is valid. *See State v. Smothers*, 2025-Ohio-5250, ¶ 67 (1st Dist.). Officers may search a vehicle when they have probable cause to believe that the vehicle contains contraband, regardless of whether the car could be

---

[1] At the time of the events in this case, marijuana was still illegal in Ohio. Thus, this case is being decided under the law applicable to those circumstances.

moved or evidence within it destroyed. *Id*. at ¶ 66-67. "The immobilization of the vehicle or low probability of its being moved or evidence being destroyed does not remove the officers' justification to conduct a search pursuant to the automobile exception." *State v. Warnick*, 2020-Ohio-4240, ¶ 30 (2d Dist.), quoting *State v. Russell*, 2004-Ohio-1700, ¶ 34 (2d Dist.).

**{¶46}** Moreover, "[t]he absence of a traffic stop does not prevent application of the automobile exception, as it does not detract from the automobile's inherent mobility or affect the officer's belief that the vehicle contains contraband." *State v. Acoff*, 2017-Ohio-8182, ¶ 24 (1st Dist.), citing *State v. Bazrawi*, 2013-Ohio-3015, ¶ 27 (10th Dist.) ("the fact that the subject search did not occur as the result of a traffic stop and the vehicle was parked and locked when Officer George first observed the marijuana does not preclude application of the automobile exception"); *State v. Friedman*, 2011-Ohio-2989, ¶ 11 (9th Dist.) (finding "no meaningful distinction" between a search of defendant's vehicle, which was locked and parked on a residential street, and "a vehicle search conducted in the course of a valid traffic stop" when a canine alerted on the vehicle which was parked on a residential street).

**{¶47}** Next Suttle argues that "the key issue in this case is whether [Suttle] was subject to custodial interrogation such that the protections of *Miranda* were triggered." Suttle challenges the admission of his pre- and post-*Miranda*-warnings statements and the firearm. However, at the motion-to-suppress hearing, Suttle limited his challenge to the search of the vehicle. To the extent that Suttle is now arguing that all of his statements and the gun should be suppressed due to the pre-*Miranda* question regarding a gun in the car, those issues were waived. *See State v. Bishop*, 2025-Ohio-4743, ¶ 19 (1st Dist.).

**{¶48}** Moreover, as previously discussed, the officers had probable cause to

14

search the vehicle, rendering the gun admissible. *See Bazrawi* at ¶ 27, 33 (holding that the officer, who had probable cause to search the vehicle based on his observation of marijuana, lawfully seized a gun when it was discovered in plain view during the search).

**{¶49}** At the second motion to suppress, Suttle sought to exclude his admission that a gun was in the vehicle because the officer failed to provide *Miranda* warnings before questioning him. The issue was whether the public-safety exception to the *Miranda* warnings applied in this case, eliminating the need for *Miranda* warnings.

**{¶50}** In general, when "police take a suspect into custody and then ask him questions without informing him of [his *Miranda* rights], his responses cannot be introduced into evidence to establish his guilt." *State v. Bailey*, 2022-Ohio-4028, ¶ 11 (1st Dist.), quoting *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). Under the public-safety exception, when officers ask "questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to elicit testimonial evidence from a suspect," they do not need to provide the warnings required by *Miranda*. *State v. Maxwell*, 2014-Ohio-1019, ¶ 113, quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984). For the exception to apply, the State must establish that the officer reasonably believed "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id.* at ¶ 117, quoting *Quarles* at 428.

**{¶51}** It was undisputed that the officer had arrested Suttle prior to asking him about a gun in the vehicle, and that the officer had not provided *Miranda* warnings to Suttle. The parties presented no testimony at the second hearing, and the court relied on a short video clip and the testimony elicited at the first suppression hearing in

reaching its decision.

{¶52} At the first motion-to-suppress hearing, the sergeant testified that he reasonably believed that Suttle might possess a weapon because he was responding to a broadcast that someone in a silver vehicle with an Ohio temporary tag had brandished a firearm while driving. Suttle was driving a silver vehicle with an Ohio temporary tag in the area where someone had brandished a gun. The sergeant also testified that after Suttle initially parked the vehicle, he exited from the driver's seat. Suttle walked away from the vehicle, then returned and accessed the driver's compartment.

{¶53} The second officer had also observed Suttle exiting from the vehicle and saw Suttle moving around in the vehicle. Then, he observed Suttle go back to the vehicle, roll up the windows, and lock the car doors before again walking away from the car. Therefore, the first condition, that the officers reasonably believed that Suttle might have a weapon, was satisfied.

{¶54} Based on the record, the second condition has not been met. The trial court found that the second officer asked the question for officer safety. However, at the first motion to suppress, the second officer testified that he decided to search the vehicle to prevent the destruction of evidence. He did not mention public safety or testify that he had a reasonable need to protect himself or the public from an immediate danger from a firearm. Consequently, the trial court's factual finding was not supported by competent, credible evidence, and Suttle's admission should have been suppressed.

{¶55} Because Suttle's statement was improperly admitted into evidence, this court must determine whether the error was harmless. *See Maxwell*, 2014-Ohio-1019, at ¶ 123, quoting *State v. Conway*, 2006-Ohio-791, ¶ 78, citing *Chapman v. California*,

386 U.S. 18, 24 (1967) ("A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt."). Whether the error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. *Id.* "Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, citing *Chapman* at 23.

{¶56} Here, the statement did not contribute to the convictions. The testimony established that Suttle was driving the vehicle when the sergeant first observed him. The sergeant testified that he saw Suttle exit from the vehicle, after he initially parked the vehicle, and then return to the vehicle. Suttle, who had the car key, accessed the driver's compartment and locked the doors and rolled up the windows. Both officers testified that Suttle's locking of his car doors and rolling up the windows after observing a police officer, suggested he was attempting to conceal something from the police.

{¶57} A third officer found the gun in the pocket of the driver's-side door, inches from the driver. The grip of the red or maroon gun and the magazine were sticking out of the door pocket. The door pocket was a different color, enhancing the visibility of the gun. This officer testified that the gun was immediately visible when he opened the driver's door.

{¶58} Suttle agreed that nothing was covering or concealing the gun and that the gun color was different from the door. He also agreed that the purpose of the pocket of the driver's side door is to easily access an item while a person is driving. Additionally, as previously noted, Suttle did not challenge his post-*Miranda* statements, and his post-*Miranda* statements included multiple statements regarding the gun and its ownership. Accordingly, the erroneous admission of Suttle's statement

17

was harmless beyond a reasonable doubt in view of the remaining evidence establishing his guilt.

**{¶59}** We overrule the first assignment of error.

## Sufficiency

**{¶60}** Next, Suttle contends that the convictions were not supported by sufficient evidence because the State failed to prove he constructively possessed the firearm or that he carried a concealed weapon. Both convictions require proof of possessing a firearm. *See* R.C. 2923.13(A)(2) ("no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance . . .."); R.C. 2923.12 ("No person shall knowingly carry or have . . ..").

**{¶61}** When a defendant challenges the sufficiency of the evidence, "the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 2017-Ohio-9189, ¶ 19 (1st Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶62}** Suttle contends that the State failed to prove that he constructively possessed the gun because the sergeant never testified that he saw him holding or carrying the gun.

**{¶63}** "To have a firearm means that the offender has actual or constructive possession of the gun." (Cleaned up.) *State v. Geralds*, 2025-Ohio-2209, ¶ 37 (1st Dist.). When a person can exercise dominion and control over a firearm, he is in constructive possession of the gun, even if he is not physically possessing the gun. *Id.*; *State v. DeVaughn*, 2020-Ohio-651, ¶ 32 (1st Dist.); *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus; *Jenks* at the syllabus.

**{¶64}** The State can establish constructive possession with circumstantial

18

evidence. *See Geralds* at ¶ 38; *State v. English*, 2010-Ohio-1759, ¶ 32 (1st Dist.). "Possession of a firearm may be inferred when a defendant has exercised dominion and control over the area where the firearm was found." *Id.*, citing *State v. Gardner*, 2017-Ohio-7241, ¶ 35 (8th Dist.). Constructive possession may be inferred by an awareness of a firearm that is within easy reach. *Id.*, citing *State v. Hicks*, 2023-Ohio-2209, ¶ 10 (1st Dist.). "But a person's mere presence in the vicinity of a firearm, alone, does not create an inference of constructive possession." *Hicks* at ¶ 10.

**{¶65}** The evidence established that Suttle was driving the vehicle with a gun in the compartment located on the driver's-side door. The grip of the gun and the magazine were sticking out of the door pocket, and the gun was accessible to the driver, within inches of the driver's seat. The officer immediately observed the gun when he opened the driver's-side door. Suttle used the driver's door to enter and exit from the vehicle and reenter the vehicle to lock the doors and roll up the windows.

**{¶66}** Viewing the evidence in the light most favorable to the State, we cannot say that the State failed to meet its burden of proving, beyond a reasonable doubt, that Suttles had dominion and control over the gun and was aware of its presence. Therefore, any rational trier of fact could have found the State proved this element of the crime.

**{¶67}** Suttle further argues that the State failed to prove he was carrying a concealed weapon because the weapon protruded from the door pocket, and therefore, was not concealed.

**{¶68}** Suttle was charged with knowingly having a handgun, concealed ready at hand. *See* R.C. 2923.12(A)(2). A partially concealed gun satisfies the definition of concealed. *See In re M.M.*, 2015-Ohio-3485, ¶ 16 (1st Dist.), citing *State v. Almalik*, 41 Ohio App.3d 101 (8th Dist.) ("Even a partially concealed gun can be found to be

'concealed' under R.C. 2923.12."); *State v. Dixon*, 1987 Ohio App. LEXIS 10212 (8th Dist. Dec. 24, 1987) (a gun was concealed when "only a part of the gun butt was visible when the car door was open and the driver was outside of the car"); *State v. Bozeman*, 1990 Ohio App. LEXIS 5372 (8th Dist. Dec. 6, 1990) (the defendant's firearm was concealed when "only the butt of the firearm was discernable"); *State v. Pryor*, 2012-Ohio-1033, ¶ 14 (1st Dist.) ("a defendant can be convicted under R.C. 2923.12 even if the gun is partially visible").

**{¶69}** In this case, the gun was partially concealed in the pocket of the driver's-side door. When the driver's door was opened, the gun was immediately visible. Therefore, the conviction was supported by sufficient evidence.

**{¶70}** We overrule the second assignment of error.

### Manifest Weight

**{¶71}** In his third assignment of error, Suttle contends that the guilty verdicts were contrary to the weight of the evidence because Suttle and his fiancée testified that Suttle did not know the gun was in the vehicle.

**{¶72}** In reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting

*State v. Wilson*, 2007-Ohio-2202, ¶ 24.

{¶73} The jury observed the testimony of both witnesses, "and we are mindful of the jury's 'superior first-hand perspective in judging the demeanor and credibility of witnesses.'" *State v. Suffel*, 2015-Ohio-222, ¶ 33 (3d Dist.), quoting *State v. Phillips*, 2014-Ohio-5162, ¶ 125 (10th Dist.). The jury was in the best position to weigh the evidence and evaluate the credibility of the witnesses' testimony. Therefore, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice.

{¶74} Accordingly, we overrule the third assignment of error.

### Prosecutorial Misconduct

{¶75} Next, Suttle argues that the trial court erred in allowing the prosecutor to engage in prosecutorial misconduct by making improper closing argument comments, which shifted the burden of proof, violating his right to a fair trial.

{¶76} Suttle did not object to these comments, and has therefore, waived all but plain error. *See State v. Hayes*, 2020-Ohio-5322, ¶ 41 (1st Dist.). Under the plain-error doctrine, the appellant must show an "error," a deviation from a legal rule, and the error must constitute an obvious defect in the trial court's proceedings. *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The appellant must demonstrate "a reasonable probability that the error resulted in prejudice." *Id.* An appellate court will correct a plain error under exceptional circumstances and only to prevent a manifest miscarriage of justice. *Id.* at ¶ 23.

{¶77} "The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights." *State v. Lang*, 2011-Ohio-4215, ¶ 155. "[A] prosecutor has wide latitude in summation to describe what the evidence shows and the reasonable inferences that

may be drawn from such evidence." *State v. Lee*, 2017-Ohio-7377, ¶ 17 (1st Dist). A prosecutor is permitted to draw reasonable inferences from the evidence presented at trial and comment on those inferences during the closing argument. *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001).

**{¶78}** During closing argument, defense counsel explained to the jury that Suttle's conversation with the second officer about the gun was Suttle's attempt to protect his fiancée and resulted from his fear and anxiety. Defense counsel further argued that Suttle did not know the gun was in the vehicle.

**{¶79}** In his rebuttal argument, the prosecutor addressed the defense's argument by pointing out that Suttle claimed that the gun belonged to his fiancée, then changed his story, and said it belonged to another person in the car. The prosecutor stated,

> [Defense counsel] got up here and said, of course he is going to distance himself because he is trying to protect his girlfriend. But at that point, he was scared. He was scared for himself. He was distancing himself from that gun because he knew it was there.
>
> So this shifting story, he sure knows a lot about who this gun belongs to without knowing the gun was there, wouldn't you say?
>
> The gun right there for the driver to see. And it's not like he was surprised when they [the police] came back and said we found the gun. He didn't go, Oh what? Where was it . . . ? There is no denial. He is just shifting that it wasn't his gun.
>
> Again, he didn't deny being the driver today.

**{¶80}** Viewing the statements in the context of the entire trial, the prosecutor's remarks were proper comments on the evidence. The comments expressed reasonable

inferences to be drawn from Suttle's testimony and from the conflicting statements Suttle made to the officer. It is not misconduct for a prosecutor to comment on the credibility of witnesses based on their testimony or suggest that a witness was lying. *See State v. Jones*, 2002 Ohio App. LEXIS 1665, *11-12 (2d Dist. April 12, 2002).

**{¶81}** We overrule the fourth assignment of error.

## Conclusion

**{¶82}** Having overruled Suttle's four assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**KINSLEY, P.J.,** and **MOORE, J.,** concur.